Filed 4/4/16  P. v. Hollins CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066405 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD244828) |
| TERRY CARRY HOLLINS et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of San Diego County, David M. Gill, Judge.  Judgments affirmed as modified.  Remanded with directions.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant Terry Carry Hollins.

Cannon & Harris and Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant Marcus Anthony Foreman.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted both Terry Carry Hollins and Marcus Anthony Foreman (together defendants) of two felonies: (1) robbery (count 1: Pen. Code,[1] § 211), and (2) possession of a firearm by a felon (count 2: § 29800, subd. (a)(l)). As to each defendant, the jury found to be true allegations that (1) he was a principal in the commission in the robbery and, in the commission of that offense, at least one principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(l) (hereafter section 12022.53(e)(l)); and (2) he personally used a firearm within the meaning of section 12022.53, subdivision (b). As to each defendant, the jury found to be *not* true an allegation under section 182.22, subdivision (b)(l), that he committed the two charged offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. In a bifurcated proceeding, the trial court found to be true allegations under sections 667.5, subdivision (b), and 668 that Hollins had served two prior prison terms, Foreman had served one prior prison term, and both defendants had failed to remain free of prison custody and free of the commission of an offense resulting in a felony conviction for five years after their release from prison.

On July 18, 2014, the court sentenced Hollins to an aggregate state prison term of 17 years and Foreman to an aggregate state prison term of 16 years eight months.

On appeal, defendants—both of whom are African-American—contend the court violated their federal constitutional rights to equal protection and trial by a jury drawn

---

[1] All further statutory references are to the Penal Code.

2

from a representative cross-section of the community, and thereby committed reversible error, when Hollins's trial counsel—who was joined by Foreman's counsel—made a *Batson/Wheeler*[2] objection to the prosecutor's exercise of peremptory challenges dismissing two prospective African-American jurors, and the court overruled the objections. Defendants also contend the court violated their federal constitutional rights to due process and a fair trial, and thereby committed reversible error, by denying their motion to bifurcate the trial on the gang allegations. Hollins also contends his "vicarious gang firearm use" sentence enhancement (§ 12022.53, subd. (e)(l)) should be stricken because the evidence is insufficient to sustain it. The Attorney General acknowledges the enhancement under section 12022.53(e)(l), which the court imposed against both defendants, should be stricken.

We affirm defendants' convictions, but strike their section 12022.53(e)(l) sentence enhancements. Accordingly, we affirm Hollins's and Foreman's judgments as modified, and remand the case to the superior court with directions to correct their abstracts of judgment.

---

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

FACTUAL BACKGROUND

A.  *The People's Case*

Shortly before 8:20 a.m. on December 6, 2012, three young African-American men—defendants and a third suspect, Wilbert Ross III[3]—who were armed with semiautomatic handguns and were not wearing masks, entered the office of a recycling company on the southeast corner of 28th Street and Imperial Avenue in southeast San Diego and stole about $1,000 from Fawaz Kalasho, the manager.  Hollins wore a gray fleece jacket with nothing on his head, Foreman wore a big puffy blue jacket and a white beanie, and the third suspect wore a black beanie.

Shortly before the robbery, Luis Garcia, who was working at his tire shop at 28th Street and Imperial Avenue near the recycling center, saw three African-American men walk together past his shop on 28th Street toward Imperial Avenue.  At least one of the men was wearing a big puffy blue jacket.  A few minutes later, Garcia heard a noise that sounded like a fight and saw the same three men jogging together down the other side of 28th Street toward Commercial Street.  As he was looking toward Commercial Street, Garcia then saw a "newer" red Chevrolet Camaro "taking off."

Later that day, San Diego Police Officer Micah Miller, who received a description of the Camaro, spotted a newer bright red Camaro near the scene at 16th Street and Market Street.  When Officer Miller activated the lights and siren of his patrol car, the

_____

3      Count 2 of the amended information in this case charged Ross with possession of a firearm by a felon (§ 29800, subd. (a)(l)).  The court granted the People's pretrial motion to dismiss this charge against Ross.

4

Camaro accelerated and decelerated numerous times until it ultimately stopped in the middle of the 94 freeway about 100 yards west of the 28th Street off-ramp. Two African-American males exited from the Camaro and ran southbound into some bushes. The driver, who also was an African-American male, stayed in the car. Officer Miller contacted the driver. At trial, Officer Miller identified Hollins as the driver. The police found $290 on Hollins's person.

San Diego Police Sergeant Cory Mapston and another uniformed officer pursued on foot the two African-American males who ran from the Camaro, Foreman and Ross. During the pursuit, Sergeant Mapston saw that Foreman had both of his hands concealed, holding what he believed to be a gun underneath a shirt. Video surveillance showed Foreman concealing something in bushes near the driveway of a home near the 94 freeway. At one point, Sergeant Mapston lost sight of Foreman. Shortly thereafter, Foreman emerged and surrendered. Foreman had $308 and a black beanie on his person. The police found a semiautomatic handgun wrapped in a bandana on the side of the driveway. Foreman's DNA was found on the gun. Ross was apprehended shortly after Foreman was arrested. A white beanie was found in one of his pockets.

A search of the red Camaro revealed a big puffy blue jacket and other items of clothing. Foreman's DNA was found on that jacket. Hollins's DNA was found on a gray jacket. A surveillance video showed Foreman, wearing a big puffy blue jacket, Hollins wearing a black beanie, and Ross wearing a white beanie, walking towards the recycling yard shortly before the robbery.

5

During a curbside lineup a few hours after the robbery, Kalasho identified Hollins as one of the robbers. A few months before trial, Kalasho again identified Hollins. Kalasho identified Hollins and Foreman during the trial. Kalasho also identified the gray and big puffy blue jackets and the white and black beanies as articles of clothing that defendants and Ross wore during the robbery. Kalasho specifically recalled seeing the gun that was recovered shortly after Foreman was detained. It had a unique shiny plate on the top, and he testified he got a good look at it during the robbery because it was pointed at him.

Michael Wilburn, an employee of the recycling company who witnessed the robbery, identified defendants during a curbside lineup and again at trial as two of the men involved in the robbery. At trial Wilburn identified Foreman as the robber who wore the big puffy blue jacket and the robber whom he saw sticking a gun in his waistband. Wilburn recalled Foreman's distinctive walk and braided hair on the back of his head. He also recalled seeing three young African-American men in a newer red Camaro near the recycling center while walking to work shortly before the robbery.

San Diego Police Detective Juan Cisneros testified as a gang expert. He testified that defendants and Ross were documented members of the West Coast Crips criminal street gang.

B. *Defense Case*

Scott Fraser, a forensic psychologist, testified generally about witness identifications and how identifications can be influenced and sometimes can be inaccurate.

6

Michael Howard, a private defense investigator, interviewed Wilburn in May 2013. Wilburn said that one of the robbers had a distinctive or "gimpy" walk and braided hair. Wilburn told Howard he identified one man at a curbside lineup based on the guy's gimpy walk, braided hair, and general features.

DISCUSSION

I. *OVERRULING OF DEFENDANTS' BATSON/WHEELER OBJECTION*

Defendants first contend the court violated their federal constitutional rights to equal protection and trial by a jury drawn from a representative cross-section of the community, and thereby committed reversible error, when Hollins's trial counsel[4]—who was joined by Foreman's counsel[5]—made a *Batson/Wheeler* objection to the prosecutor's exercise of peremptory challenges to excuse two prospective African-American jurors, and the court overruled the objections. We reject this contention.

A. *Background*

During voir dire, defendants' attorneys challenged two of the prosecutor's peremptory challenges that related to prospective African-American jurors, V.J. and R.G. During questioning prior to the challenges, V.J. stated that she was an English teacher at Lincoln High School and an adjunct professor at San Diego City College, when she taught in middle school she cofounded an organization that brought former gang members into schools to teach about gang violence, and she was currently helping to plan

---

[4]    Ray Aragon.

[5]    Gloria Collins.

7

a citywide event "geared toward black males in reference to making the right choices." V.J. also stated that Foreman looked familiar, and, because of her close workings with former gang members and troubled African-American youth, this case was perhaps too close to home for her and would possibly raise her "passions." Specifically, the following exchange occurred between the prosecutor[6] and V.J.:

> "[The prosecutor]: Miss [J.], *I think you talked about your passions being raised or something maybe about the gang aspect. Am I correct about that*?
>
> "[V.J.]: *Yes, you are*.
>
> "[The prosecutor]: "What exactly did you mean about that?
>
> "[V.J.]: "Because I work so closely based on my students and various organizations and programs over the years and now. Maybe not as direct as I did in the past, but just, you know, personal I guess to a certain degree, you know, the whole aspect of everything.
>
> "[The prosecutor]: Would this hit home a little harder than maybe someone who doesn't do your line of work or have your kind of background?
>
> "[V.J.]: I'm sorry?
>
> "[The prosecutor]: *Is this going to potentially hit home to you a little closer than, say, someone who hasn't had your kind of background* [*and*] *experience*? [¶] *I'm trying to understand how your passions would be raised*.
>
> "[V.J.]: I see what you're saying. [¶] *I guess because I've done so much work within this arena, you know, to try to combat it, that's where the passion's coming from*. [¶] It won't alter any, you know, decisions that are made based upon the facts. But, um, I guess an example would be I may not be as passionate about biology because I'm not a biology person. Right?

---

6       Kristian Trocha.

"[The prosecutor]: So this is something you have a little familiarity with?

"[V.J.]: Exactly.

"[The prosecutor]: I completely understand." (Italics added.)

R.G., the second prospective African-American juror at issue here, stated that he was a retired electrical engineer. He indicated that everything has to be proved to a certain level of certainty and that the levels of certainty in some areas of science are quite high. R.G. stated he would have a "problem" making a decision based solely on circumstantial evidence. Specifically, the following exchange occurred between the prosecutor and R.G.:

"[The prosecutor]: Given that his Honor has defined [for] you reasonable doubt as the standard in our case, it's not exactly the most exact level. Would you agree?

"[R.G.]: Uh-huh.

"[The prosecutor]: Is that—I'm sorry. [The court reporter] has to write—is that a 'yes'?

"[R.G.]: Yes. I'm listening.

"[The prosecutor]: Do you see a potential problem with applying maybe a higher level, based upon your own experience when you're looking at evidence in this case, more analytical as opposed to big picture?

"[R.G.]: *I think I'm going to have a problem making decisions with circumstantial evidence.* I mean, the facts are there and if it's proven, you know, to me, that's all that matters, you know?

"[The prosecutor]: In terms of—I don't want to belabor it anymore. Circumstantial evidence. You'll be hearing about DNA. I'm assuming in some point of your career you came across chemistry.

9

"[R.G.]: Yeah.

"[The prosecutor]: DNA, would you agree, is a very powerful tool in a criminal trial?

"[R.G.]: Yes.

"[The prosecutor]: Would it surprise you to learn that DNA is a form of circumstantial evidence?

"[R.G.]: No, not really." (Italics added.)

Soon thereafter, the prosecutor exercised his third and fourth peremptory challenges to excuse R.G. and V.J., respectively. Hollins's counsel, Aragon, thereafter raised a *Batson-Wheeler* objection, claiming the prosecutor dismissed V.J. and R.G. because they were African-Americans like the defendants. Aragon told the court, "We're left with an all-white jury at this point in time for the record. So that's the reason I'm making the motion that perhaps the panel should all be removed and we should start over again." Foreman's counsel, Collins, joined in the objection.

The court gave the prosecutor an opportunity to explain his reasons for excusing the two prospective jurors, and the prosecutor first explained his reasons for excusing V.J.:

> "[V.J. is] a school teacher at Lincoln High School. She's also an adjunct professor at City College. Her primary focus of studies is English. She was involved in something called Disabled Organization of O'Farrell Middle School, which appeared to be geared at bringing former gang members in almost to a Scared Straight Program with middle school students at O'Farrell Park. She was also involved in another group where African American males where the primary focus is in getting them to make better decisions.

10

"I think all things considered, this sounds like an individual that may be sympathetic—overly sympathetic as to perceived gang members or actual gang members.

"She's also a school teacher, which, in my experience, has been a very difficult and unfavorable juror for prosecution cases. And especially she's an English-type major, I don't believe she would be favorable to . . . the People's case in terms of—I think she'd be more sympathetic to the defense simply because we've heard now at least Mr. Foreman is admitted to being a gang member. We keep hearing the term 'young man' thrown around and 'poor decision making.' I think this is a person that would potentially be sympathetic to the defense.

"Lastly, she had a fear that her passions would be raised by evidence in this case. I asked her what she meant on that topic, and all she could really answer was she is too familiar with this type of activity, it's too close to home in her mind. I don't know what that means in terms of, ah, where she would go, but given the fact that she wasn't able to answer the question one way or another, I frankly don't want to take the chance with somebody like that."

The court overruled the defendants' *Batson-Wheeler* objection with respect to the dismissal of V.J., stating:

"All right. I don't know that I'm particularly impressed by your reference to the fact that [V.J.'s] an English teacher. But . . . *the other points you mentioned, I . . . think provide a proper basis for the exercise of the peremptory challenge. Not based solely on the impermissible fact of her race or ethnicity*." (Italics added.)

The court then asked the prosecutor to address defendants' *Batson-Wheeler* objection regarding the dismissal of R.G. The prosecutor explained his reasons for excusing R.G.:

"In terms of [R.G.,] . . . his answers to some of my questions particularly at the end in the circumstantial evidence category, I believe *he mentioned he would have a hard time looking at circumstantial evidence and basing a decision upon that*. [¶] He has a scientific background. He is more familiar with the scientific

11

method. In my experience, people with a scientific background, such as engineers like himself, do deal with higher standards of proof in terms of their own line of work. [¶] And I think that did come out when he started mentioning the fact about the circumstantial evidence. [¶] For the most part, I thought he was an adequate juror until he himself mentioned the part about he would have a problem with circumstantial evidence and basing a decision upon that." (Italics added.)

The court overruled the defendants' *Batson-Wheeler* objection with respect to the dismissal of R.G., stating:

"All right. I recall . . . those statements on his part. I think he is— I'm treating him as Afro American, although I'm not sure exactly what the totality of his ethnic background might be. But . . . I'm content to consider him to be an Afro American. [¶] But *I think that's a . . . satisfactory explanation of the exercise of the peremptory challenge, so I'm convinced it was not based on impermissible grounds of his race or his ethnicity.* So defense has made its record and I'll deny the request . . . ." (Italics added.)

B. *Applicable Legal Principles*

"Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity." (*People v. Davis* (2009) 46 Cal.4th 539, 582 (*Davis*), citing *Batson*, *supra*, 476 U.S. at p. 97 & *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)

A rebuttable presumption exists that a prosecutor has exercised his or her peremptory challenges in a constitutional manner, and the burden is on the objecting defendant to demonstrate impermissible discrimination. (*People v. Dement* (2011) 53 Cal.4th 1, 19; *People v. Cleveland* (2004) 32 Cal.4th 704, 732 (*Cleveland*).)

The California Supreme Court has explained that when the defense raises a timely *Batson/Wheeler* challenge to the prosecutor's use of peremptory challenges, a three-stage

12

procedure applies: "'*First*, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] *Second*, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] *Third*, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 786 (*Riccardi*), quoting *Johnson v. California* (2005) 545 U.S. 162, 168, italics added.)

Regarding the first stage of *Batson/Wheeler* error analysis, the high court has clarified that, "[t]o make a prima facie showing of group bias, 'the defendant must show that under the totality of the circumstances it is *reasonable to infer discriminatory intent*.'" (*Davis*, *supra*, 46 Cal.4th at p. 582, italics added.)

If the defendant meets his or her burden of making a prima facie showing of group bias under this "reasonable inference" standard, "[t]he proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given [by the prosecution] for the peremptory challenge, *not* on the objective *reasonableness* of those reasons. [Citation.] So, for example, if a prosecutor believes a prospective juror with long, unkempt hair, a mustache, and a beard would not make a good juror in the case, a peremptory challenge to the prospective juror, sincerely exercised on that basis, will constitute an entirely valid and *nondiscriminatory* reason for exercising the challenge." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) "All that matters is that the prosecutor's

13

reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*Ibid.*)

The prosecutor's explanation need not rise to a level that justifies the exercise of a challenge for cause. (*People v. Williams* (1997) 16 Cal.4th 635, 664 (*Williams*).) "[A]dequate justification by the prosecutor may be no more than a 'hunch' about the prospective juror [citation], so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias and not simply as 'a mask for race prejudice.'" (*Ibid.*)

### 1. *Standard of review*

A reviewing court applies a deferential standard of review in analyzing a trial court's finding of fact on the "ultimate question" of whether a prosecutor acted with discriminatory intent in exercising a peremptory strike. (*Riccardi, supra,* 54 Cal.4th at p. 787.) The California Supreme Court has explained that "because the trial court is 'well positioned' to ascertain the credibility of the prosecutor's explanations and a reviewing court only has transcripts at its disposal, on appeal '"the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous.'" (*Id.* at p. 787.)

### C. *Analysis*

Having reviewed the record of the voir dire under a deferential standard of review, as we must (*Riccardi, supra*, 54 Cal.4th at p. 787), we conclude that nothing in this record undermines the court's implicit determination in overruling defendants'

14

*Batson/Wheeler* objections that the prosecutor provided subjectively genuine race-neutral reasons for excusing the two prospective African-American jurors. The "law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275.) As already discussed, "adequate justification by the prosecutor may be no more than a 'hunch' about the prospective juror [citation], so long as it shows that the peremptory challenges were exercised for reasons other than impermissible group bias and not simply as 'a mask for racial prejudice.'" (*Williams*, *supra*, 16 Cal.4th at p. 664.)

1. *V.J.*

Here, the voir dire record supports the court's implicit determination that the prosecutor provided subjectively genuine race-neutral reasons for excusing V.J., who stated she was a high school English teacher and an adjunct college professor. In explaining his reasons for dismissing V.J., the prosecutor expressed his concern that she might be "overly sympathetic" to perceived or actual gang members because of her involvement in an organization that "appeared to be geared at bringing former gang members in . . . a Scared Straight Program with middle school students," and her involvement in another organization the "primary focus" of which was to get African-American males to make better decisions.

The prosecutor also expressed concern that V.J. "would potentially be sympathetic to the defense" because the jury had already heard that Foreman was a gang member[7] and that V.J. "had a fear that her passions would be raised by evidence in this case." The prosecutor told the court he did not want to "take a chance with somebody like [V.J.]" because, when he asked her about her "passions," she "wasn't able to answer the question one way or another."

Finding that the prosecutor's foregoing reasons were "[n]ot based solely on the impermissible fact of [V.J.'s] race or ethnicity," the court determined those reasons "provide[d] a proper basis for the exercise of the peremptory challenge."

The record supports the court's determination that the prosecutor provided subjectively genuine race-neutral reasons for excusing V.J. During voir dire, V.J. expressed her sympathy for, and discussed her laudable efforts to help, young gang members. Specifically, she stated that when she was a middle school teacher, she cofounded a campus organization that invited former gang members to speak to students about gang violence. She also stated she was "co-planning a citywide event" that was "geared toward black males in reference to making the right choices, doing the right things." When the prosecutor asked her how she felt "about sitting on a case involving a young man who is a gang member," V.J. replied, "[E]motionally, I am pretty mixed," and, "I think just my passion about just the whole case is starting to really be raised." She acknowledged that Foreman looked familiar.

---

7       The People's gang expert, Detective Cisneros, testified that defendants and Ross were documented members of the West Coast Crips criminal street gang.

16

The prosecutor later asked V.J. what she meant when she talked about her passions being raised in this case. She replied, "Because I work so closely based on my students and various organizations and programs over the years and now. She then vaguely stated, "Maybe not as direct as I did in the past, but just, you know, personal I guess to a certain degree, you know, the whole aspect of everything." After eliciting additional responses from V.J., the prosecutor, showing he was having difficulty understanding her responses, elicited another response by saying, "I'm trying to understand how your passions would be raised." V.J. responded, "I guess because I've done so much work within this arena, you know, to try to combat it, that's where the passion's coming from." She then indicated her belief that her rising "passion" and "mixed" emotions would not "alter" her decisions in this case.

The foregoing record supports a finding that the prosecutor's foregoing reasons for exercising a peremptory challenge to dismiss V.J. were race-neutral and not pretextual and that he excused her in a constitutional manner because he was genuinely concerned she might be unable to serve as an impartial juror.

We reject Foreman's claim that the prosecutor's stated reasons were pretextual and unreasonable because the prosecutor "left on the jury panel a juror [(juror No. 4)] who was much more likely to be sympathetic to the defendants." Foreman correctly points out that juror No. 4 knew people who were in gangs and had a few friends who were in a gang. However, unlike V.J., juror No. 4 did not express mixed emotions or passions about the case. On the contrary, when the court asked juror No. 4 whether his experience with gangs and his knowing gang members would cause him to prejudge this case in any

17

way, he unequivocally replied, "No, not at all." He also unequivocally indicated that neither of the defendants would be at any disadvantage because of his experiences with gangs, and that both sides were entitled to a fair trial.

2. *R.G.*

The voir dire record also supports the court's implicit determination that the prosecutor provided subjectively genuine race-neutral reasons for excusing R.G., a retired engineer. As discussed, *ante*, R.G. candidly admitted, "I think I'm going to have a problem making decisions with circumstantial evidence." R.G.'s admitted "problem" with making a decision based on circumstantial evidence was a subjectively genuine race-neutral reason on which the prosecutor based his decision to excuse R.G.

II. *DENIAL OF DEFENDANTS' MOTION FOR BIFURCATION*

Defendants also contend the court violated their federal constitutional rights to due process and a fair trial, and thereby committed prejudicial error, by denying their motion to bifurcate the trial on the gang allegations. We reject this contention.

A. *Background*

Foreman brought a motion in limine to bifurcate the trial of the criminal street gang enhancement allegations, claiming the gang evidence was overly prejudicial and "incendiary." In their written opposition, the People argued the gang evidence was highly relevant to the issues of identity, intent, and motive.

The court conducted a hearing on the bifurcation motion. Foreman's counsel reiterated the arguments made in Foreman's motion, and Hollins's counsel told the court that Hollins was joining in the motion. The prosecutor reiterated the arguments he had

18

made in his written opposition to the motion. The court denied the motion, finding that (1) the gang evidence was highly relevant to the contested "central" issue of identity, as well as to the issue of motive; and (2) the "substantial relevance" of the evidence was "not outweighed by the probability of undue prejudice."

B. *Applicable Legal Principles*

A trial court has discretion to bifurcate gang enhancement allegations from the substantive charges. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).)

However, a gang enhancement allegation is different from a prior conviction allegation in that "[a] prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*Hernandez*, *supra*, 33 Cal.4th at p. 1048.) The California Supreme explained in *Hernandez* that "less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation" (*ibid.*), and the trial court's discretion to deny bifurcation of a charged gang enhancement is broader than its discretion to admit gang evidence when the gang enhancement is not charged (*id*. at p. 1050). In exercising its discretion to grant or deny bifurcation of a trial on a gang enhancement allegation, the trial court may consider the countervailing factors of "increased expenditure of funds and judicial resources" that would result from bifurcation. (*Ibid*.)

19

C. *Analysis*

We need not decide whether the court abused its discretion in denying defendants' motion to bifurcate the trial on the gang enhancement allegations because, even if we were to assume the court erred, we would also conclude any such error was harmless under both the *Watson* and the *Chapman* harmless error standards.[8] The evidence of defendants' guilt was overwhelming. The issue of identity, which was the principal issue at trial, was not a close question. The evidence shows that, although the robbery victim, Kalasho, did not recognize Foreman during a curbside lineup conducted in the afternoon on the day of the robbery, he did identify Hollins with 90 percent certainty. Wilburn, an eye witness, unequivocally identified Foreman and Hollins during a curbside lineup as two of the three men involved in the robbery, and he identified Foreman again at trial in May 2014, almost one and a half years after the December 2012 robbery. A surveillance video showed Foreman wearing a big puffy blue jacket, Hollins wearing a black beanie, and Ross wearing a white beanie, walking together towards the recycling yard shortly before the robbery. As discussed in the factual background, *ante*, witnesses identified defendants' and Ross's clothing as the clothing the perpetrators wore, the defendants were stopped in a red Camaro similar to the one seen leaving the scene of the robbery,

---

[8]     Under the *Watson* harmless error standard, the trial court's judgment may be overturned only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Under the *Chapman* harmless error standard, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681; *Chapman v. California* (1967) 386 U.S. 18, 24.)

Foreman was seen hiding a gun identified by one of the witnesses as one of the guns used in the commission of the offense, and the defendants tried to evade law enforcement after a traffic stop was initiated.

Apart from the foregoing strong evidence of defendants' guilt, the jury was instructed under CALCRIM No. 1403 that the gang evidence could be considered only for the limited purpose of determining whether defendants acted with the intent, purpose, and knowledge that is required to prove the charged gang enhancement, or that the defendants had a motive to commit the crimes charged. Nothing in the record suggests the jury considered the gang evidence for an improper purpose, and it is presumed the jury followed the limiting instruction. (See *People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9.) Furthermore, the fact that the jury found the gang enhancement allegation to be *not* true demonstrates the jury was not so influenced by the gang evidence that it unquestioningly accepted the prosecution's case as a whole and failed to evaluate the evidence. For all of the foregoing reasons, we conclude the court's assumed error in denying defendants' bifurcation motion was harmless.

### III. *SECTION 12022.53(E)(1) SENTENCE ENHANCEMENTS*

Last, Hollins contends his 10-year "vicarious gang firearm use" enhancement under section 12022.53(e)(l) should be stricken because the evidence is insufficient to sustain it. The Attorney General agrees, stating that "the section 12022.53[(e)(l)] enhancement should be stricken." We conclude section 12022.53(e)(l) enhancements were improperly imposed against both Hollins and Foreman and must be stricken.

A.  *Background*

The court sentenced Hollins to an aggregate state prison term of 17 years, consisting of the upper term of five years for his count 1 robbery conviction, plus a consecutive term of 10 years for the count 1 firearm enhancement imposed under section 12022.53, subdivision (b); plus a concurrent midterm of two years for his count 2 conviction of possession of a firearm by a felon; plus two consecutive one-year terms for his two prison priors.

In sentencing Hollins, the court also imposed but stayed a prison term of 10 years for the count 1 firearm enhancement under section 12022.53(e)(l).  Hollins's abstract of judgment reflects that the court imposed and stayed that section 12022.53(e)(l) enhancement.

In sentencing Foreman, the court similarly imposed but stayed under section 654 a prison term of 10 years based on the jury's true finding on the count 1 section 12022.53(e)(l) enhancement allegation brought against him.  Foreman's abstract of judgment reflects that the court imposed and stayed that section 12022.53(e)(l) enhancement.

B.  *Analysis*

The 10-year prison term enhancement provided in section 12022.53(e) "appl[ies] to any person who is a principal in the commission of an offense (even if not the person using or discharging the weapon) only if it is pled and proved that the 'person violated subdivision (b) of Section 186.22' (§ 12022.53(e)(1)(A)) and that a principal in the crime personally used the weapon (§ 12022.53(e)(1)(B))."  (*People v. Miranda* (2011) 192

22

Cal.App.4th 398, 411.) Thus, a section 12022.53(e) enhancement lawfully may not be imposed unless the prosecution pleads and proves that the defendant violated section 186.22, subdivision (b).

Here, as noted, the jury found to be *not* true an allegation under section 182.22, subdivision (b)(l) that Hollins committed the two charged offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. The jury made similar findings as to Foreman. Thus, the court's imposition of 10-year enhancements under section 12022.53(e) against both defendants was improper. Accordingly, we conclude those section 12022.53(e) enhancements must be stricken and Hollins's and Foreman's abstracts of judgment must be corrected to reflect the modification of the judgments entered against them.

## DISPOSITION

Defendants Hollins's and Foreman's count 1 section 12022.53(e) sentence enhancements are stricken. As modified, the judgments entered against them are affirmed. The matter is remanded to the superior court with directions to correct Hollins's and Foreman's abstracts of judgment to reflect the striking of the section

12022.53(e) enhancements, and to forward certified copies of the corrected abstracts of judgment to the Department of Corrections and Rehabilitation.


                                                                    NARES, Acting P. J.

WE CONCUR:

HALLER, J.

McDONALD, J.


24